# Illinois Official Reports

## Appellate Court

*In re Commitment of Rendon*, 2017 IL App (1st) 153201

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF ENRIQUE RENDON (The People of the State of Illinois, Petitioner-Appellee, v. Enrique Rendon, Respondent-Appellant). |
| District & No. | First District, Third Division<br>Docket No. 1-15-3201 |
| Filed | April 26, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 98-CR-80004; the Hon. Alfredo Maldonado, Judge, presiding. |
| Judgment | Reversed; remanded. |
| Counsel on Appeal | Daniel T. Coyne, Matthew M. Daniels, Michael R. Johnson, and Kate E. Levine, of Law Offices of Chicago-Kent College of Law, of Chicago, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Michael M. Glick and Gopi Kashyap, Assistant Attorneys General, of counsel), for the People. |
| Panel | JUSTICE LAVIN delivered the judgment of the court, with opinion.<br>Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1     This appeal is brought by the fourth person ever committed as a sexually violent person (SVP) under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2014)) in Cook County. Respondent, Enrique Rendon, voluntarily stipulated to being an SVP and was civilly committed in 2002, then underwent sex offender treatment designed to reduce his risk of recidivism. After being recommended for release in 2010, respondent entered conditional release, where he remained in the community while scrupulously supervised by Department of Human Services (the Department) mental health professionals. The State then successfully moved to revoke his conditional release in 2012, claiming that he was a danger to the safety of others in the community and that he had violated several conditions of his release, including his alleged failure to honestly answer questions about his sexual behavior and fantasies in polygraph examinations. This court reversed that judgment, and once the mandate issued, respondent was returned to conditional release, over the State's specific objection. *In re Commitment of Rendon*, 2014 IL App (1st) 123090, ¶ 41.

¶ 2     This particular appeal stems from the trial court's determination, following review of respondent's 2015 annual mental health report, that there was *no probable cause* to find respondent had made sufficient progress in treatment such that he was *no longer an SVP*. This probable cause decision came despite some noted progress in treatment and even though he obtained the lowest possible score in standard testing designed to gauge the risk of sexual offender recidivism. The trial court therefore denied respondent a full evidentiary hearing in the matter. Had respondent succeeded in obtaining a full hearing, it would have been his first chance to argue whether he had reached such a low risk of recidivism as to warrant discharge. We reverse and remand with instructions for the trial court to conduct such an evidentiary hearing.

¶ 3                                                      BACKGROUND

¶ 4     After being convicted and imprisoned for the kidnapping and sexual assault of an eight-year-old girl, respondent was imprisoned and was released after serving six years. He violated his parole just two years later by trying to lure children into his car. He was also found in bed by his 17-year-old daughter as he lay naked with her friend. The State then moved in 1998 to commit respondent under the Act. Four years later, respondent stipulated to the State's petitions and entered mental health sex offender treatment under the auspices of the Department in a "Treatment and Detention Facility" (TDF), where he remained from 2002 to 2010. This stipulation avoided any hearing in front of a judge or jury to decide whether he ought to have been committed as an SVP. During treatment, respondent admitted to a variety of sexual offenses apart from the sexual assault and luring incidents detailed above. We will not enumerate his many reported sexual offenses but do note that his self-reporting while in therapy filled more than three single-spaced pages and catalogued illegal sexual acts that reportedly began at age 11 and concluded at 50. He also boasted that on more than 20,000 occasions in public places like the "L" train, he had engaged in "frottage," the act of rubbing against a person (in his case, young women) for sexual gratification.

¶ 5     In 2010, based principally upon the report of Dr. Edward Smith, respondent entered conditional release. Dr. Smith's detailed report indicated that respondent had made

significant progress, mainly by understanding his offense cycle, and that he had completed a relapse prevention plan. Along with other findings, this led Dr. Smith to conclude that respondent was a candidate for a "highly structured and supervised" conditional release, despite the fact that he felt respondent was still an SVP. As noted above, respondent remained on conditional release in an apartment for some 21 months where he was consistently monitored and tested by mental health professionals. He was also prescribed Eligard, a drug that helped him lessen his deviant urges through the lowering of testosterone levels. After it was determined that respondent may have lied during a polygraph examination when questioned about his sexual behavior/fantasies, the State successfully moved to revoke respondent's conditional release in June 2012, a judgment that was subsequently reversed by this court in November 2014. *Id.* ¶ 41.

¶ 6    Between the time respondent's conditional release was revoked and while the matter was pending on appeal, respondent was returned to institutional treatment. There, he admitted that he had been regularly fantasizing about offending women and young females with frottage while on conditional release and thus engaging in high-risk, deviant fantasies and masturbatory behaviors. He had been making plans to bring women to his apartment. Specifically, in therapy respondent admitted that he had been "holding in" information by keeping secrets and being dishonest, especially prior to the allegedly failed polygraph and before the Eligard treatments. On a scale of 1 to 10, with 10 being the highest, he said he was at a 7 with regard to his sexual urges, deviant fantasies, and masturbatory behavior. He reported that during that period he was "slipping a lot" yet denied having any unauthorized people in his apartment. Respondent eventually joined "Phase V" of the therapy group, the highest therapy level intended to transition an SVP into the community.

¶ 7    In spite of these noted problems and while waiting for this court's opinion to issue, in August 2014, respondent petitioned for conditional release while also asking the court to appoint an expert on his behalf and asking for a probable cause hearing. As stated, some months later, in November 2014, this court reversed the trial court's judgment terminating respondent's conditional release.

¶ 8    With that reversal and respondent's pending release back into the community, the State moved to again revoke his conditional release based upon a January 2015 report by Dr. Smith in which he stated that despite respondent's noted progress, respondent was an SVP who should remain in a treatment facility. One month later, a Dr. Raymond Wood prepared a report pursuant to respondent's earlier request. In that report, Dr. Wood found that respondent had made progress but also believed that he should remain on conditional release, as opposed to discharge. (Not surprisingly, though it would have been statutorily admissible, Wood's report was not later submitted for the court's consideration in the probable cause hearing.) In February 2015, pursuant to this court's mandate and over the State's objection, the trial court ordered respondent back on conditional release but of a type that was described as "maximum supervision," enabling respondent to "take out his garbage, collect his mail and do laundry in his building."

¶ 9    Some four months into this second stint on conditional release, in June 2015, Dr. Smith conducted another annual reexamination. This is the reexamination that was used in the "no probable cause hearing" that is the subject of this appeal. In the 32-page report, Dr. Smith laid out, in detailed fashion, a litany of self-reported sexual offenses committed by respondent prior to his confinement, as well as the treatment that he had received over the

- 3 -

years while in the TDF and on conditional release, including consideration of annual reexaminations of respondent from 2008 to 2014. This analysis included reports of numerous professional tests of respondent designed to assess his truthfulness, *i.e.*, whether he was still perseverating about sexual deviancy, whether he would react physiologically to materials designed to test or trigger his erotic responses, and otherwise gauging his progress in treatment. Respondent's most recent 2013 penile plethysmography (PPG) test, for example, indicated no deviant arousal on the 22 segments of images presented.

¶ 10　　Dr. Smith opined that respondent met the criteria for five separate sexual disorders as listed in the fifth and latest edition of the Diagnostic and Statistic Manual (DSM-5). Those diagnoses are "Pedophilic Disorder, Sexually Attracted to Females, Nonexclusive Type" (owing to his numerous sexual offenses against prepubescent females including the crimes that he was imprisoned for); "Other Specified Paraphilic Disorder, Non-Consenting Females" (related to his reporting of numerous instances of using force, weapons, and intimidation to gain sexual compliance); "Frotteuristic Disorder" (stemming from his self-reported obsession with rubbing against people for sexual pleasure); "Alcohol and Stimulant Use Disorder"; and "Antisocial Personality Disorder." Dr. Smith's lengthy report and analysis established that respondent over the course of his time in the Department had made some significant progress while still identifying some very sobering issues related to the possibility that respondent was not being entirely truthful about his potential to reoffend, as respondent had admitted truthfulness problems.

¶ 11　　Nonetheless, when interviewed by Dr. Smith in June 2015, respondent reported he was transparent in therapy and kept his mind occupied so as to avoid deviant thoughts, thus steadily decreasing in deviant sexual fantasies, and stated he had not masturbated since returning on conditional release in February 2015. Fantasies came and went, but respondent successfully intervened, for example, when viewing young females on television and completed sexual fantasy/masturbation logs, budget sheets, and phone logs. He was taking Eligard, which he reported was quite successful in sublimating his deviant sexual urges. Respondent's conditional release agent described him as compliant and self-reliant, having adjusted back to community living from the TDF with no rule violations and negative drug tests. Respondent, however, acknowledged he often thought about being at the TDF as a means of helping him cope with the challenges he encountered in the community.

¶ 12　　Dr. Smith noted that by statutory definition, a person is dangerous if it is "substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2014). Dr. Smith tested respondent pursuant to a "Static-99R" test which has shown "moderate accuracy in ranking offenders according to their relative risk of recidivism." Respondent scored 1 out of 12, which placed him in the lowest risk of recidivism, *i.e.* the likelihood of being charged or convicted of another sexual offense. Dr. Smith reported that despite the "low risk" described on the Static-99R test, the Department of Corrections had decided that respondent fit within a "preselected high-risk/high needs" category, which eliminates all but 96% to 98% of sex offenders being released from prison in Illinois, and noted that other offenders with the same score of one on the Static-99R test from that preselected high-risk category had sexually reoffended at a rate of 9% in 5 years and 15.8% in 10 years. Dr. Smith opined that this re-designation was appropriate because the State had filed a petition to declare respondent an SVP, a circuit court found that there was probable cause that he was an SVP, and that "judge or jury concluded" that he was an SVP. Dr. Smith

also discussed the findings of a number of sex offender recidivism studies, all of which to one degree or another found that recidivism rates steadily decreased over time, with rates in several studies approaching zero after 60 years of age. Dr. Smith noted that research has not reached a general agreement as to how age affects recidivism rates, but then he determined respondent's age was a protective factor at this time, while also noting that factor was "mitigated by the circumstances that led to his Conditional Release being revoked in June 2012."

¶ 13    Dr. Smith further identified "additional risk factors," *i.e.* risk factors existing outside of risk assessment instruments, which included respondent's antisocial personality disorder, self-regulation problems, impulsiveness/recklessness, early onset sexual offending, intoxication during an offense, deviant sexual interest, intimate relationship conflicts, substance abuse, neglect, and physical/emotional abuse. Dr. Smith opined that given the Static-99R, these additional risk factors and "the circumstances and behaviors that resulted in [respondent's] Conditional Release being revoked in June 2012 suggest he is at a substantial probability to engage in acts of sexual violence." Thus, despite the Static-99R score of one and studies predicting low recidivism after age 60, Dr. Smith opined that respondent was still an SVP under the terms of the Act and that his condition had not materially changed since his most recent reexamination. With that opinion, Dr. Smith effectively recommended against respondent obtaining a full hearing regarding whether he was entitled to discharge from the Department. That is, there was no reasonable ground to believe respondent had been cured as an SVP, although Dr. Smith nonetheless found conditional release was appropriate at that time.

¶ 14    Accordingly, the State moved for a finding of no probable cause to believe that respondent was no longer an SVP. Respondent, who was present at the probable cause hearing and represented by an attorney, objected. Counsel for respondent argued that changed circumstances indicated respondent was no longer an SVP, and as such, he was entitled to a discharge hearing. Counsel cited respondent's lack of a disciplinary record while in the TDF, the Static-99R score of one (showing that over 60% of sex offenders scored higher than respondent), respondent's age of 68 and the accompanying age studies, and statistics indicating respondent was less likely to reoffend than the median average sex offender, per Dr. Smith's report. Citing Dr. Smith's statistic regarding an estimated recidivism rate of 9% in five years, counsel claimed it "falls far short of the statutory criteria for civil commitment." Additionally, counsel noted that Dr. Smith did not sufficiently delineate how the dynamic risk factors influenced the low Static-99R score. Counsel criticized Dr. Smith's problematic reliance on respondent's 2012 conditional release revocation as a factor supporting Dr. Smith's ultimate professional conclusion that he was still an SVP, when this court had reversed that revocation judgment. Counsel argued in short that this evidence "leads to the conclusion" that respondent is "not substantially probable to re-offend" and had presented a plausible account for a discharge hearing.

¶ 15    In response to the trial court's query, the State argued that Dr. Smith's report was not on its face "enough to trigger an evidentiary hearing." The State argued the report, when considered comprehensively, showed respondent continued to meet the criteria of an SVP.

¶ 16    Following arguments, the trial court found no probable cause to warrant a full evidentiary hearing to determine whether respondent was no longer an SVP. In fact, the trial court found there was a plausible account to find respondent was still an SVP based on Dr. Smith's

report, which was not at least contradicted by any other report in evidence, and given that respondent had not affirmatively filed a petition for discharge. This timely appeal followed.

¶ 17                                    ANALYSIS
¶ 18                          *Standard of Review and SVP Law*
¶ 19      The parties contend, and we agree, that the question of whether there is probable cause to believe respondent is no longer an SVP so as to warrant a full evidentiary hearing is subject to *de novo* review. *In re Commitment of Wilcoxen*, 2016 IL App (3d) 140539, ¶ 28.

¶ 20      In Illinois, a respondent is entitled to be annually reexamined by mental health professionals to determine whether he or she has made sufficient progress to be on conditional release or discharged. 725 ILCS 207/55(a) (West 2014). In this case, respondent was already on conditional release at the time Dr. Smith submitted the June 2015 reexamination report. As such, under the statute, the filing of the reexamination report required the trial court to hold a probable cause hearing to determine whether respondent was entitled to discharge from custody, that is, unless respondent affirmatively waived his right to the petition. See 725 ILCS 207/65(b)(1) (West 2014). Here, the record is clear that respondent neither asked for discharge nor specifically waived his right to do so. Therefore, the probable cause hearing necessarily ensued under the statute by operation of law without respondent having to affirmatively file the petition. There, while reviewing only the reexamination reports and parties' arguments, the trial court was required to "determine whether facts exist to believe that since the most recent periodic reexamination ***, the condition of the committed person has so changed that he *** is no longer a sexually violent person." *Id.* A sexually violent person is one who has been convicted of a sexually violent offense and is dangerous to others because he suffers from a mental disorder that makes it substantially probable that he will engage in acts of sexual violence. 725 ILCS 207/5(f) (West 2014). A finding of probable cause garners a full evidentiary hearing in which the State must prove by clear and convincing evidence that the committed person is still a sexually violent person. 725 ILCS 207/65(b)(2) (West 2014).

¶ 21      We note, initially, that respondent takes issue with the 2012 amendment to the discharge provision in section 65, which took effect immediately. See Pub. Act 97-1075 (eff. Aug. 24, 2012). Under that amendment, and as stated, a court in considering probable cause according to section 65(b) must examine whether since "the most recent periodic reexamination" facts show a changed condition in the respondent, such that he is no longer an SVP. *Id.* The previous version of section 65(b) did not contain a reference to "the most recent periodic reexamination." See *id.* Respondent argues the 2012 amendment is unduly restrictive, forcing a petitioner to essentially rely *only on facts* occurring since the *most recent reexamination*, within the preceding year. He argues this has a retroactive effect and we must therefore apply the pre-amendment statute.

¶ 22      The State responds that the 2012 amendment explicitly provides that the amendment applies to petitions pending at the effective date of the amendment and petitions filed thereafter. 725 ILCS 207/65(c) (West 2014). Reading the statute in its plain language so as to divine legislative intent, as we must, and in context with the other provisions of section 65, "petition" refers to petitions for discharge, including petitions like the present one, that were filed by operation of law and not the initial petition for civil commitment of respondent. *In re Detention of Hardin*, 238 Ill. 2d 33, 40 (2010). As defendant's petition for discharge was

filed by operation of law in 2015, several years after the amendment, the State contends, and we agree, that the circuit court's probable cause determination was based on section 65 then in effect, which contained the amended language. Indeed, in the absence of contrary legislative intent or manifest injustice, courts will apply the law in effect at the time of their decisions. See *Daley v. Zebra Zone Lounge, Inc.*, 236 Ill. App. 3d 511, 515 (1992); see also *Doe A. v. Diocese of Dallas*, 234 Ill. 2d 393, 407 (2009) (the expression of legislative intent must be given effect, absent constitutional prohibition).

¶ 23    Moreover, respondent's reading of the statute is itself unduly restrictive since review of a reexamination report does not preclude consideration of a respondent's full mental health and sexual history or relevant historical facts. Indeed, in Dr. Smith's June 2015 report itself, he reviewed the other annual reexamination reports from 2008 to 2014, thus taking them into account. Construing the statute logically, it simply means the court must consider the professional conclusions as to a respondent's status in the most recent report and any changed circumstances. See *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 72. We agree with the State that the amendment is simply a clarification of what the circuit court was already tasked with determining in any case involving application for discharge or conditional release—*i.e.* whether the respondent's *current status* reflects a mental disorder or that he is *still* a danger to society such that he is substantially probable to reoffend. See *General Telephone Co. of Illinois v. Johnson*, 103 Ill. 2d 363, 377 (1984) (if the amendment merely clarified the law as it existed before, then no substantive change occurred that would raise a due process issue). Even absent the amendment, it is common sense that a court would turn to the most recent professional examination of a respondent to answer this very important public safety question. For example, if a sex offender had regressed in treatment to the point where a professional recommends no discharge, it would make little sense for a court to cite an examination report from two years prior stating that the respondent had made significant progress and then allow discharge based on that previous report. For those reasons, respondent's contention as to the applicability of the pre-amendment statute fails.

¶ 24    We thus return to the merits of determining whether the trial court erred in this instance. Respondent, who initially stipulated to the State's SVP petition and who never formally petitioned for discharge, contends that he is entitled to an evidentiary hearing to determine whether he is still a sexually violent person as defined by the Act. We agree.

¶ 25                              *The* Wilcoxen *Case*

¶ 26    We find the recent decision in *Wilcoxen*, 2016 IL App (3d) 140359, instructive. In *Wilcoxen*, the respondent was convicted of criminal sexual assault, and just as he was about to be released after serving only 10 years of his 22-year sentence, the State petitioned to have him declared an SVP. Seven years later, a jury agreed, and he was placed in a TDF. After the State filed several motions for a finding of no probable cause, the trial court eventually held a hearing and found that there was no probable cause to believe that the respondent was no longer an SVP. Removing the double negative, the court essentially ruled that there was probable cause to believe that he was still an SVP, which vitiated any evidentiary hearing. This decision was made by the trial court on the basis of reports submitted by two psychologists, one who was retained by the State and one retained by the respondent.

¶ 27    The State's psychologist, Dr. Gaskell, conducted a battery of tests that are substantially similar to those that were taken of respondent. These included the Static-99R, where the

- 7 -

respondent scored a four. Like Dr. Smith, Dr. Gaskell classified the respondent as a "high-risk/high needs" individual and estimated his risk of recidivism as 20.1% in 5 years and 29.6% in 10 years. Dr. Gaskell's ultimate conclusion, like that of Dr. Smith, held that it was "substantially probable" that the respondent would reoffend if released, and he recommended that he remain classified as an SVP.

¶ 28 The respondent's psychologist, Dr. Rosell, also used a number of tests, including the Static-99R where he scored the respondent as a 3 on the scale of 12. He conducted another test (MATS-1), which predicted an eight-year recidivism rate of 6% among individuals aged 60-69 years old, although his score of four placed him in the high range. Dr. Rosell concluded that the respondent did *not* pose a substantial risk of reoffending. The respondent was 61 at the time he was tested by Dr. Rosell.

¶ 29 On appeal, the Third District found that the respondent had met his "very low burden" to obtain an evidentiary hearing, while acknowledging at the same time that the respondent possibly would not succeed in establishing at an evidentiary hearing that he is no longer an SVP. Relying on the supreme court's decision in *Stanbridge*, 2012 IL 112337, the *Wilcoxen* court noted that in a preliminary probable-cause discharge proceeding, which is intended only to establish essential or basic facts as to probability, the respondent bears the burden of demonstrating only a "plausible account" that he is no longer an SVP and the court must make this determination without weighing evidence like competing professional opinions. *Wilcoxen*, 2016 IL App (3d) 140359, ¶ 35. In other words, the respondent must present sufficient evidence that he no longer meets the elements for commitment, in so far as (1) he no longer has a mental disorder or (2) he is no longer dangerous to others because the person's mental disorder no longer creates a substantial probability that he will engage in acts of sexual violence. In other words, the evidence must show changed circumstances in the committed person, professional knowledge or methods, or legal definitions. *Id.* ¶ 36.

¶ 30 In light of those standards, the *Wilcoxen* majority found that the respondent's positive experience in treatment, his commitment to a treatment plan, his psychologist's professional opinions relating to his low risk of recidivism, and the testing results all "supported respondent's claim and warranted an evidentiary hearing." *Id.* ¶ 37. As to the actuarial and PPG tests, the majority emphasized that the results, while meaningful, did not "compel a conclusion that it is 'substantially probable' that respondent will reoffend," reasoning further that "if probable means it is more likely than not that respondent will reoffend and substantially probable means his reoffending is substantially more likely to occur than not, these results of objective, statistical tests militate against, not in favor of, that finding." *Id.* ¶ 48.

¶ 31 *Respondent's Case*

¶ 32 Likewise, in the case *sub judice*, respondent has adequately met his low burden to obtain an evidentiary hearing. The test result that established respondent's recidivism rate at 1 on a scale of 12, his age of 68, the studies showing a low reoffense risk with increased age, respondent's compliance with hormone drug therapy, and his current behavioral methods for handling his mental disorder, are all evidence constituting at least a plausible account that respondent is no longer an SVP. That is, it is plausible evidence of changed circumstances from the time respondent initially stipulated to the SVP designation and over the course of 18 years in treatment and twice being on conditional release in the community. Indeed, when

compared to the respondent in *Wilcoxen*, respondent has completed more treatment and reached phase V in therapy, advanced more in age (68 compared to 61), scored a lower recidivism rate on the Static-99R test, and scored better on his most recent PPG examination. Based on the foregoing, we conclude respondent is at least entitled to an evidentiary hearing to determine whether he is no longer dangerous to others because his mental disorder no longer creates a substantial probability that he will engage in acts of sexual violence. As in *Wilcoxen*, we acknowledge that an evidentiary hearing may not lead to the conclusion that respondent is no longer a sexually violent person. To be sure, the State may very well establish by clear and convincing evidence at an evidentiary hearing that respondent should be denied discharge from the Department's legal custody. That evidence might reference respondent's significant difficulties during his first stint on conditional release and also his retained expert's report, which was not presented at the probable cause hearing and which we have not reviewed since it does not appear in the record, but in which the expert reportedly opined that respondent was still an SVP who should remain in conditional release. Notwithstanding those possibilities, for our present purposes and given the record before us, respondent has presented sufficient evidence to show probable cause for an evidentiary hearing.

¶ 33    In reaching this conclusion, we wish to address several matters raised during oral arguments on this case. We first address respondent's claim as to his burden at the probable cause discharge hearing. Respondent notes that his discharge petition was filed by operation of law, as he was reexamined yet did not waive his right to petition, which automatically triggered the trial court's duty to conduct a probable cause hearing under section 65(b)(1). Respondent argues that in such an instance, he should have *no burden* at the hearing, thus distinguishing his case from one where the respondent affirmatively files a petition for discharge over the Secretary of Human Services' objection under section 65(b)(1) and then has a probable cause hearing.

¶ 34    This argument is directly contradicted by *Stanbridge*, which drew no distinction between a discharge petition filed by operation of law and one filed affirmatively by a respondent. In both scenarios, *Stanbridge* held "the movant bears the burden to show sufficient evidence to warrant a hearing on whether the person is 'still a sexually violent person.' "[1] (Emphasis omitted.) *Stanbridge*, 2012 IL 112337, ¶ 67 (quoting 725 ILCS 207/65(b)(1), 70 (West 2008)).

¶ 35    This brings us to the State's argument that respondent, in order to fulfill his burden at the probable cause hearing, was required to present his own evaluator's report. The State notes that respondent's case is different from the fact pattern in *Wilcoxen*, since there, the respondent had an appointed psychologist opining that he was no longer an SVP. Here, Dr. Smith opined that respondent was most definitely still an SVP and thus not entitled to any further hearing.

---

[1] In *Stanbridge*, the court addressed the 2008 Act. Under the 2008 Act, section 65(b)(1) contained the provision wherein a discharge petition is filed by operation of law, while section 70 contained the provision wherein the respondent affirmatively filed the petition. The 2012 amendment collapsed these statutory sections into one, section 65, and repealed section 70, but the amended content of section 65(b)(1) is not appreciably different from the 2008 version insofar as the respondent can obtain a probable cause hearing by operation of law or by affirmatively filing a petition.

¶ 36    The State's arguments are resolved by carefully reviewing the Act. Section 65(b)(1) mandates only that the court consider the submitted "reexamination reports." See 725 ILCS 207/65(b)(1) (West 2014). This necessarily includes the Department's reexamination report filed annually under section 55. See 725 ILCS 207/55(a) (West 2014). While section 65(b)(1) does not mandate that a respondent submit his own evaluator report, it also does not foreclose respondent from doing so. See 725 ILCS 207/55(a) (West 2014) ("At the time of a reexamination under this Section, the person who has been committed *may* retain or, if he or she is indigent and so requests, the court *may* appoint a qualified expert or professional person to examine him or her." (Emphasis added.)). At the same time, the Act expressly provides that the State can choose its own expert to evaluate respondent at a full evidentiary hearing. See 725 ILCS 207/65(b)(2) (West 2014). From examining the above-stated provisions, we think the Act makes clear that the Department evaluators are neutral in the sense that they are neither aligned with the petitioning party, nor the party opposing the petition, albeit necessarily employed by the State of Illinois. Thus, presenting a Department evaluator report does not automatically mandate a finding in favor of the State, and either party may argue for or against the report.

¶ 37    We thus reject the State's related argument that respondent had to show a "plausible expert opinion" that he's no longer an SVP, since the *Stanbridge* holding clearly requires only that the trial court find from the discharge hearing evidence "a plausible account" that the committed person is no longer an SVP. *Stanbridge*, 2012 IL 112337, ¶¶ 62, 67. Here, as stated and under our *de novo* review, we conclude a trier of fact could find that the actuarial tests, respondent's age, and present treatment status rebutted the conclusion reached by Dr. Smith that respondent was still an SVP. In other words, Dr. Smith's conclusion drawn from the facts in his report does not preclude our determination that respondent has presented a plausible account that he is no longer an SVP. Again, the quantum of evidence is low, and Dr. Smith, a mental health professional, did not address that statutory matter specifically. Likewise, the prohibition against weighing evidence or making credibility determinations at this stage does not preclude critical consideration of the evidence in a doctor's report, weighing the related inferences, and determining whether that evidence is consistent with the doctor's final opinion. *Cf. id.* ¶ 58 (at the probable cause stage, the role of the trial court is not to choose between conflicting facts or inferences or to engage in a *full and independent* evaluation of the expert's credibility and methodology, but rather to consider whether plausible evidence or reasonable inference supports the movant's claim). This will help avoid simply rubber-stamping doctor's reexamination reports, especially where liberty is at stake.

¶ 38    In that sense, we must address certain frailties in Dr. Smith's report, while acknowledging that the law and mental health can clearly diverge at times. Even considering the face value of Dr. Smith's actuarial test analysis, it is arguably *reductio ad absurdum*, as it holds that anybody who is found to be an SVP under the State's commitment petition, whether by judge or jury, is automatically excluded from the 96% to 98% of sexual offenders who have a very low risk of recidivism and instead should be subject to a preselected group of offenders who are at a higher risk (5% at 5 years and 15.8% at 10 years). This necessarily means that every person who is found to be an SVP would, *a priori*, forever remain an SVP, a conclusion which is markedly inconsistent with the gravamen of the Act itself. The SVP law is predicated upon the possibility that a person can successfully be engaged in treatment that would remove the "diagnosis" of SVP, thus entitling him to release. See 725 ILCS

- 10 -

207/40(a) (West 2014) ("If a court or jury determines that the person who is the subject of a petition under Section 15 of this Act is a sexually violent person, the court shall order the person to be committed to the custody of the Department for control, care and treatment *until such time as the person is no longer a sexually violent person*." (Emphasis added.)). Accepting this opinion is equivalent to stating that the finding of SVP status by a court and a jury is equivalent to a civil form of life imprisonment without an evidentiary hearing ever being held to determine whether the individual respondent should be released. We cannot sanction such a result.

¶ 39       Dr. Smith's report is also replete with analyses of studies that reflect a greatly reduced rate of recidivism among offenders as they age, with recidivism being virtually unreported after the age of 60. In addition, Dr. Smith's stated basis for finding respondent substantially likely to reoffend included not just the Static-99R, but "the circumstances that led to his Conditional Release being revoked in June 2012." Dr. Smith also cited as support the so-called dynamic risk factors, which were almost all factors (like deviant sexual interest, intoxication during an offense, etc.) that landed respondent in civil commitment in the first place. Thus, Dr. Smith appears to have put respondent into a higher risk of recidivism than some authoritative literature would have suggested based upon the circumstances that this court specifically held were inappropriate reasons for his removal from conditional release and based upon respondent's initial *admitted* status as an SVP. See *Rendon*, 2014 IL App (1st) 123090. After a full evidentiary hearing, a fact finder could weigh Dr. Smith's report and conclude that it could be meaningfully challenged.

¶ 40                                    CONCLUSION

¶ 41       Based on the foregoing, we reverse the judgment of the trial court finding no probable cause for an evidentiary hearing. We remand the case for further proceedings consistent with this opinion.

¶ 42       Reversed; remanded.