**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 180239-U

Order filed November 17, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* COMMITMENT OF DONALD SAMIER JR. | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | Appeal No. 3-18-0239 Circuit No. 14-MR-725 |
| v. | ) ) | |
| Donald Samier Jr., | ) ) | The Honorable Norma Kauzlarich, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE CARTER delivered the judgment of the court.
Justices McDade and Schmidt concurred in the judgment.

**ORDER**

¶ 1     *Held*:   In an appeal in a sexually violent person (SVP) reexamination case, the Appellate Court ruled that the trial court properly found that there was no probable cause to warrant that a full evidentiary hearing be held to determine whether respondent was still an SVP. The appellate court, therefore, affirmed the trial court's judgment.

¶ 2     In December 2014, respondent, Donald Samier Jr., was found to be a sexually violent

person (SVP) and was civilly committed under the Sexually Violent Persons Commitment Act

(Act) (725 ILCS 207/1 *et seq.* (West 2014)) to a secure facility for institutional care and treatment. In January 2018, after a required annual reexamination of respondent had been conducted, the State filed a motion in the trial court seeking to have the court find that there was no probable cause to warrant that a full evidentiary hearing be held to determine whether respondent was still an SVP.[1] Upon reviewing the reexamination report and considering the arguments of the attorneys, the trial court made a finding of no probable cause and ordered respondent's continued commitment. Respondent appeals. We affirm the trial court's judgment.

¶ 3                                              I. BACKGROUND

¶ 4        In August 1994, respondent pled guilty to aggravated criminal assault and home invasion and was sentenced to 40 years in prison (30 years for criminal sexual assault and 10 years for home invasion with the sentences to be served consecutively). In September 2014, when respondent was nearing the end of his prison sentence, the State filed a petition under the Act to involuntarily commit respondent as an SVP. The State alleged in the petition that respondent had been convicted of aggravated criminal sexual assault in the above case and that he suffered from the following three mental disorders that affected his emotional or volitional capacity and predisposed him to commit acts of sexual violence: (1) other specified paraphilic disorder, sexually aroused by nonconsenting females, in a controlled environment; (2) other specified personality disorder, with antisocial and narcissistic traits; and (3) alcohol use disorder, in sustained remission, in a controlled environment. The State also alleged in the petition that respondent was dangerous because his mental disorders made it substantially probable that he would engage in acts of sexual violence.

_____

[1] The statute actually requires the trial court to determine whether there is probable cause to believe that the committed individual is "no longer" an SVP. See 725 ILCS 207/65(b)(1) (West 2018). To avoid any confusion caused by the use of a double negative (the "no" in "no probable cause" and the "no" in "no longer"), we have replaced "no longer" with "still" at times throughout this order.

¶ 5        Respondent was appointed an attorney to represent him in the proceedings. In December 2014, after consulting with his attorney, respondent stipulated that he was an SVP and agreed to be committed to the Illinois Department of Human Services (Department). The trial court accepted the stipulation and ordered that respondent be committed to the Department for institutional care and treatment in a secure facility until further order of the court.

¶ 6        In December 2015, respondent filed a petition for conditional release and a motion for independent evaluation. Shortly thereafter, the State filed a motion for periodic reexamination and a finding of no probable cause. The State refiled its motion a few months later. Attached to the State's motion was a copy of respondent's reexamination report, which was dated December 2015 and had been prepared by Dr. Edward Smith, a licensed clinical psychologist. The State alleged in its motion that Smith had opined in the report that respondent had not made sufficient progress in treatment to be conditionally released from the secure facility.

¶ 7        In June 2016, a hearing was held in the trial court on respondent's petition for conditional release, on respondent's motion for independent evaluation, and on the State's motion for periodic reexamination and a finding of no probable cause. Respondent was present in court for the hearing and was represented by his attorney. During the hearing, the trial court proceeded first on the State's motion. After listening to the arguments of the attorneys, the trial court granted the State's motion and made a finding of no probable cause. Based upon that ruling, the trial court also denied respondent's petition for conditional release and ordered that respondent remain committed to the secure treatment facility.

¶ 8        The trial court next addressed respondent's motion for independent evaluation. The State argued that respondent's motion was untimely because under the statute, respondent had to wait one year from the trial court's denial of his petition for conditional release (which had just

3

happened only a few moments earlier) before he could file a new petition. Respondent's attorney disagreed, stating:

> "I don't think there is anything barring this court from ordering an independent evaluation based on his current growing disabilities which are compounded everyday [*sic*]. He's not a threat, which I think is obvious with his wheelchair and walker, and that would be mostly the basis for, you know, maybe a shortcut a few days or weeks, but he is not a danger."

After listening to the arguments of the attorneys, the trial court agreed with the State and denied respondent's motion for independent evaluation.

¶ 9    In January 2017, the State filed a notice, which was later amended, in the trial court setting the case for hearing on the State's previously filed motion for periodic reexamination. No such motion, however, appears in the trial court record. Nor is there any indication in the trial court record that a new reexamination report had been prepared at or near that time. The following month, the trial court entered a written order indicating that respondent's annual reexamination hearing had been held and that the State's motion for a finding of no probable cause had been granted. The trial court's written order also indicated that both respondent and his attorney were present in court for the reexamination hearing.

¶ 10    In January 2018, following respondent's most recent reexamination, the State filed a motion in the trial court for periodic reexamination and a finding of no probable cause. Attached to the State's motion was a copy of respondent's reexamination report. The report had been prepared by Dr. Nicole Hernandez, a licensed clinical psychologist and sex offender evaluator. Hernandez had reexamined respondent in November 2017 and had ultimately concluded or

4

recommended in her report (dated December 2017) that respondent was still an SVP and that he should remain committed to a secure treatment facility.

¶ 11    In conducting her reexamination, Hernandez reviewed respondent's records, including respondent's criminal history, court records, prison records, prior SVP examinations or reexaminations, and treatment records. Hernandez also conducted a clinical interview of respondent and had a peer consult regarding respondent with a fellow psychologist. Hernandez then prepared a written reexamination report. Hernandez's report discussed such matters as respondent's personal history, criminal history, medical history, treatment history, diagnosis, and risk of reoffending.

¶ 12    In her report, Hernandez described respondent's criminal history at length. Hernandez indicated that respondent had been born in 1955, had been convicted of three sexually-motivated offenses during his lifetime, and had spent most of his adult life in prison. Respondent had also been accused of other sexually-motivated offenses, of which he had not been convicted, and had been convicted of certain other offenses that were not sexually-motivated.

¶ 13    As for respondent's sexually-motivated offenses and convictions, Hernandez indicated in her report that respondent had been accused of rape in a 1976 case, had been accused of disorderly conduct in a 1983 case, had been accused of unlawful restraint in a 1983 case, had been convicted of aggravated kidnapping in a 1983 case, had been convicted of mailing threatening communications in a 1987 federal case, had been accused of criminal trespass in an uncharged 1994 incident, and had been convicted of aggravated criminal sexual assault and home invasion in the previously-mentioned 1994 case. In the 1976 case, respondent was accused of raping a female college student that he had lured into his car by offering her a ride to her dorm room. During the incident, respondent allegedly slapped the victim across the face, ripped the

5

victim's blouse and bra, threatened to choke and hurt the victim if she did not comply, and penetrated the victim's vagina with his penis. The incident occurred in October 1976. As a result of the incident, respondent was charged with rape. The charge, however, was later dismissed. The reason for the dismissal was unknown to Hernandez.

¶ 14　　　In the 1983 disorderly conduct case, respondent was accused of attempting to lure a 16-year-old female high school student into his car and telling the female victim that he wanted to "f*** [her]." Several similar incidents were apparently reported in that same area on the same day. When respondent was later questioned about the incident by the police, he admitted that he was the individual who had approached the victim. The incident occurred in March 1983. As a result of the incident, respondent was charged with disorderly conduct, but the charge was later dismissed after respondent was convicted of the aggravated kidnapping charge described below.

¶ 15　　　In the 1983 unlawful restraint case, respondent was accused of grabbing the arm of a 14-year-old female who was walking to a bus stop and trying to pull the female victim into his car. The victim resisted and yelled for help and was able to get away from respondent. The incident took place in March 1983 on the same date as the 1983 disorderly conduct incident described above and two days before the aggravated kidnapping incident of which respondent was convicted as indicated below. As a result of the incident, respondent was arrested for unlawful restraint but apparently was never convicted.

¶ 16　　　In the 1983 aggravated kidnapping case, respondent was accused of forcing a 15-year-old female high school student into his car at knifepoint and trying to remove the female victim's clothing. During the incident, respondent allegedly threatened to cut the victim's throat if she did not get into the vehicle and, at a later point, told the victim he "was going to f*** [her]." The victim was able to escape, following a struggle, and ran to an apartment building for help. The

incident occurred in March 1983, two days after the other two March 1983 incidents described above. As a result of the incident, respondent was charged with aggravated kidnapping, kidnapping, and unlawful restraint. After a jury trial, respondent was convicted of aggravated kidnapping and was sentenced to 15 years in prison. Upon his release from prison in August 1991, respondent was transferred to a federal prison to serve a sentence in the 1987 federal case described below.

¶ 17    In the 1987 federal case, respondent was accused of mailing threatening communications to two adult female victims. The first victim was or had been employed at the prison where respondent was located. She accused respondent of sending her a threatening, vulgar, and sexually explicit letter. In the letter, respondent asked the victim various sexual questions, stated that he wanted to have sex with the victim, indicated that he would rape the victim if she did not comply with his demands, and threatened to harm the victim and her daughter if she told anyone about the letter. Respondent sent a similar letter to a second female victim as well. Both of the incidents occurred in May 1987. Respondent pled guilty to one of the counts in federal court, and the other count was dismissed. He was sentenced to two years in federal prison with his sentence to run consecutively to the state prison sentence he was serving for the 1983 aggravated kidnapping.

¶ 18    In the 1994 criminal trespass incident, a female college student reported to police that an unknown individual had forced open the door of her residence (presumably when she was not at home) and had taken her security identification badge and several underwear items from her residence. The female victim stated that a possible suspect was a person she knew as "Don" who had pulled into her driveway the day before and had asked her for directions. The victim saw "Don" on her back porch a short time later. The incident took place in April 1994. When

7

respondent was later questioned about the incident by police, he indicated that he had asked the victim for directions but denied that he had committed the burglary. Respondent was given a warning for criminal trespass.

¶ 19     In the 1994 aggravated criminal sexual assault and home invasion case, respondent was accused of entering a residence and raping an 18-year-old female at knifepoint. During the incident, respondent allegedly slapped the female victim in the face, ripped off the victim's clothing, tied the victim's hands, held a knife to the victim's throat, and penetrated the victim's vagina with his penis. The incident occurred in May 1994. As a result of the incident, respondent was charged with aggravated criminal sexual assault and home invasion. He pled guilty and was sentenced to 40 years in prison as indicated above.

¶ 20     As stated previously, respondent was also convicted of some offenses that were not sexually-motivated. Hernandez noted in her report that respondent had been convicted of theft in a 1973 case, theft in a 1976 case, and breaking and entering in a 1977 case. In the 1977 breaking and entering case, which took place in Iowa, respondent pled guilty to the offense and was sentenced to 10 years in the men's reformatory. He was released on parole for that offense in December 1982.

¶ 21     With regard to respondent's conduct while in prison, Hernandez stated in her report that during respondent's most recent incarceration (his prison sentence for aggravated criminal sexual assault and home invasion), he had been found guilty of a large number (more than 150) of major and minor disciplinary infractions while in prison. Those infractions included: insolence, intimidation and threats, disobeying a direct order, abuse of privileges, damage or misuse of property, gang or unauthorized organizational activity, trading and trafficking, dangerous contraband, unauthorized property, gambling, refusing housing, possession of money, and arson.

8

¶ 22    While respondent was in prison, he also had two referrals in 1997 for sexual misconduct. The first referral was for an incident in October 1997 where respondent asked a female paralegal to give him a "blowjob." During the conversation, respondent reportedly fondled his penis with his hand. Respondent was given segregation time for the incident. The second referral was for an incident that was also in October 1997 where respondent requested a medical technician to deliver a note to a female. When the technician refused, respondent threatened the technician's children. Respondent then dropped his undergarments and began masturbating in the front of the cell.

¶ 23    Hernandez described further in her report some of the other incidents that occurred while respondent was in prison. At various times while he was in prison, respondent had sent apparently unsolicited letters to random female subjects he had seen in the newspaper. Respondent had also sent a letter to an Iowa county clerk requesting the addresses of several local teenage girls who had appeared in the local news media and had sent a letter to an Indiana sheriff's department requesting information about a female employee and the employee's relatives. In addition, respondent had sent a threatening letter to a female subject who worked for the Iowa prison system, was a possible suspect in threatening calls that had been made to a female federal public defender, and had sent a threatening and sexually explicit letter to his aunt.

¶ 24    In April 1998, respondent was recommended for placement at Tamms Correctional Center, a super maximum security prison, due to his ongoing pattern of sexual predation. While respondent was in Tamms, he sent a letter to a high school requesting two specific years of school yearbooks and had previously requested addresses of female students at the school.

¶ 25    In addition to respondent's criminal history, Hernandez described in her report respondent's prior and current sex-offender treatment history. Hernandez's report indicated that

prior to being civilly committed as an SVP, respondent had not participated in sex-offender specific treatment while he was in prison or while he was in the community. In 2004, however, respondent had apparently expressed interest in being transferred to a facility where he could participate in such treatment because he was concerned after hearing that he might be sent to a mental health facility following completion of his sentence since he was classified as a sexual predator.

¶ 26    With regard to respondent's current sex-offender treatment, Hernandez's report indicated that respondent was still in Phase I (the assessment phase) of the treatment facility's five-phase treatment program. Respondent had not yet completed his entry to treatment evaluation or his penile plethysmograph evaluation but was attending some of the treatment foundations group meetings. The report indicated that of the three or four group meetings every month, respondent usually missed one or two and did not always actively participate in the group meetings that he did attend. In addition, respondent had refused to attend some of the other different treatment groups that were offered to him. When respondent was asked by Hernandez about his lack of attendance at treatment group sessions, respondent stated that he did not attend the sessions because he needed hernia surgery and did not feel well. Hernandez also asked respondent about his refusal to take some of the group counseling classes offered to him, and respondent stated that he tried to take one group class at a time. When Hernandez asked respondent what his biggest accomplishment in treatment was in the past review period, respondent stated, "[n]othing."

¶ 27    As for respondent's behavior history in the treatment facility, Hernandez's report noted that respondent had been referred to the behavioral committee on three occasions since his commitment. He received a warning for violation of rules in January 2016, a warning for

10

insolence in July 2016, and a minor violation for horseplay in December 2016. At the time of the reexamination, however, respondent was currently on the highest privileged security living status at the treatment facility.

¶ 28　　　　With regard to respondent's medical history, Hernandez's report indicated that respondent had been diagnosed in May 2013 (prior to his commitment) with the following active problems: aortic valve disorder, arthralgia and moderate right hip pain, thyroid disease, esophageal reflux, inguinal hernia right status post repair, and obesity. Respondent had been given a surgical consult in August 2013 (presumably to have his hernia repaired) but did not want surgery at that time. Hernandez indicated further in her report that respondent "had difficulty with ambulation secondary to ongoing hernia problems and relie[d] on a wheelchair." Respondent had also been prescribed medications to manage high blood pressure and thyroid problems.

¶ 29　　　　In November 2017, as part of the reexamination process, Hernandez personally interviewed respondent. The interview lasted for approximately 40 minutes. During the interview, respondent indicated that he had sexually offended only one adult female and denied that he had sexually victimized any other individuals. Respondent commented that his cases that were dropped should not be considered and that he did not need to talk about those cases. Respondent denied that he had any sexual fantasies, deviant or healthy, during the past year and indicated that he believed that his age and the fact that he no longer used alcohol reduced his risk to reoffend. When asked if there was anything else that respondent wanted the court to know, he stated, "I'm never gonna get no recommendation to get out of here. You know that and I know that. This place is a sham."

11

¶ 30    Based upon her reexamination, Hernandez diagnosed respondent as having the following three mental disorders: (1) other specified paraphilic disorder, sexually attracted to nonconsenting females, nonexclusive type, in a controlled environment; (2) other specified personality disorder, with antisocial traits; and (3) alcohol use disorder, in a controlled environment.  Hernandez explained her diagnosis in her report and also explained the factors that led her to reach that diagnosis as to each of the three mental disorders.  Hernandez stated further in her report that respondent's mental disorders were congenital or acquired conditions that affected respondent's emotional or volitional capacity and that predisposed respondent to engage in acts of sexual violence.

¶ 31    In determining whether respondent was likely to reoffend, Hernandez considered actuarial instruments, other empirically-based risk factors, and protective factors.  The two actuarial instruments that Hernandez used with respondent were the Static-99R and the Static-2002R.  Hernandez described those actuarial instruments in her report and explained how those instruments were used.  On the Static-99R, respondent scored a six, which placed him in the highest of the five risk categories to reoffend (the well above average risk category), even though respondent's score had been reduced by three points due to his advanced age.  Hernandez noted that the recidivism rate for sex offenders with the same score as respondent would be expected to be approximately 3.77 times higher than the recidivism rate of the typical sex offender.  On the Static-2002R, respondent scored a four, which placed him in the third highest risk category to reoffend of five (the average risk category).  According to Hernandez, the recidivism rate for sex offenders with the same score as respondent on the Static-2002R would be expected to be approximately 1.38 times higher than the recidivism rate of the typical sex offender.

¶ 32 Hernandez indicated in her report that there were other empirically-based risk factors that were not considered in the actuarial instruments that she believed were present for respondent and that likely increased respondent's risk of engaging in future acts of sexual violence. Hernandez specifically identified those risk factors in her report as follows: any deviant sexual interest, any personality disorder, sexualized violence, intimacy deficits, impulsivity/recklessness, offense supportive attitudes, grievance/hostility, and lack of concern for others. Hernandez noted in her report that respondent's "scores on [the] risk instruments and his additional risk factors support[ed] that he [was] substantially probable to engage in future acts of sexual violence."

¶ 33 In evaluating respondent's risk of reoffending, Hernandez also considered whether there were any protective factors that would likely reduce respondent's risk of committing future acts of sexual violence, such as participation in sex-offender treatment, medical condition, or age. Hernandez found in her report that there were no such protective factors present in the instant case. With regard to respondent's participation in treatment, Hernandez noted that although the completion of sex-offender counseling was a protective factor, respondent had not completed counseling in this case and his commitment to treatment was inconsistent in that he failed to participate in some of the treatment groups that were offered and struggled with attendance to the treatment groups in which he did participate. In addition, according to Hernandez, respondent significantly struggled with use of cognitive distortions and with behavioral tactics that prevented him from taking full responsibility for his sexual-offending behaviors. Furthermore, Hernandez noted, respondent had not yet developed an understanding of his risk factors or developed appropriate interventions for emotion regulation and sexual deviancy. As for respondent's medical condition, Hernandez commented in her report that while a person's

13

medical condition could act as a protective factor if the condition was serious and debilitating, according to the available medical records, respondent suffered from no known medical conditions that would reduce his risk to reoffend. Finally, with regard to respondent's age, Hernandez noted that although increased age was a potential protective factor that could lower a person's risk to reoffend, there was no universal agreement in the research on how an offender's age at release impacted an offender's recidivism rates. In addition, both the Static-99R and the Static-2002R had adjustments incorporated into them for age and its relationship to decreasing risk, and Hernandez did not believe that any further age-based risk reductions (other than the ones already incorporated into the two actuarial instruments) were warranted at that time.

¶ 34    As noted previously, based upon her reexamination, Hernandez opined or recommended that respondent's condition had not changed since his last examination, that he should continue to be found to be an SVP, and that respondent had not made sufficient progress in treatment to be conditionally released from the secure facility.

¶ 35    In March 2018, respondent filed a motion for the appointment of an independent evaluator, arguing that the appointment was "crucial" to his defense and that the failure to appoint such an evaluator would violate his due process rights.

¶ 36    The following month, in April 2018, the trial court held a hearing on respondent's motion for the appointment of an independent evaluator and on the State's motion for a finding of no probable cause. Respondent was not present in court for the hearing because he did not want to get out of his wheelchair and refused to be transported to court. Respondent's attorney represented to the trial court that he had spoken to respondent by phone and that he was prepared to proceed with the hearing on respondent's behalf. The trial court considered first respondent's motion for the appointment of an independent evaluator. After listening to the arguments of the

14

attorneys, the trial court denied the motion. In so doing, the trial court noted that respondent had made minimal efforts to participate in any treatment and had failed to show any progress. The trial court also commented that respondent's refusal to come to court that day was a further indication that respondent was not a willing, cooperative participant.

¶ 37       The trial court then considered the State's motion for a finding of no probable cause. During the hearing on the motion, respondent argued that based upon his age and current medical condition, it was no longer substantially probable that he would reoffend. The State disagreed and pointed out that respondent had many of the same medical conditions when he was initially found to be an SVP. The State also noted that Dr. Hernandez had considered respondent's age and medical condition in determining respondent's risk of recidivism and had still found that it was substantially probable that respondent would reoffend. After considering the parties' arguments, the trial court granted the State's motion for a finding of no probable. In making its decision, the trial court noted that respondent had many of the same medical problems before he was found to be an SVP and again commented upon respondent's lack of progress in treatment. The trial court, therefore, remanded respondent to the Department for further care and treatment in a secure facility. Respondent appealed.

¶ 38                                    II. ANALYSIS

¶ 39       On appeal, respondent argues that the trial court erred in granting the State's motion for a finding that there was no probable cause to warrant that a full evidentiary hearing be held to determine whether respondent was still an SVP. In making that argument, respondent does not dispute that he has the mental disorders that Hernandez described in her reexamination report. Respondent asserts, nevertheless, that the trial court's ruling was still incorrect because there was evidence in the reexamination report that established a plausible account that respondent was no

15

longer an SVP such that a full evidentiary hearing on the matter was required under the law. Specifically, respondent contends, the reexamination report contained evidence that suggested he was no longer dangerous to others because he was 62 years old, was confined to a wheelchair, had several medical problems, and lacked the physical ability to carry out forcible sexual assaults. Respondent maintains, therefore, that his mental disorders no longer created a substantial probability that he would engage in acts of sexual violence. For those reasons, respondent asks that we reverse the trial court's grant of the State's motion for a finding of no probable cause and that we remand this case for the trial court to hold a full evidentiary hearing to determine whether respondent is still an SVP.

¶ 40        The State argues that the trial court's ruling on the motion was proper and should be upheld. The State asserts that the trial court correctly found that there was no probable cause to warrant holding a full evidentiary hearing because the only evidence before the trial court at the probable-cause hearing was the reexamination report of Dr. Hernandez wherein Hernandez opined that respondent's condition had not changed since his last reexamination and that he should continue to be found to be an SVP. Thus, the State contends that respondent failed in his burden to establish probable cause as necessary to require that a full evidentiary hearing be held in this case. In making that contention, the State maintains that respondent's medical condition and use of a wheelchair were insufficient to establish probable cause to believe that respondent was no longer an SVP because: (1) no expert testified to that effect; (2) many of respondent's offenses involved luring young women into his car and/or the use of a knife, which respondent's wheelchair use would not prevent and could even facilitate due to his perceived vulnerability; and (3) sexually violent offenses were not limited to acts of forcible sexual assault. For all of the

16

reasons stated, therefore, that State asks that we affirm the trial court's grant of the State's motion for a finding of no probable cause.

¶ 41     The parties both assert that the trial court's determination in this case—that there was no probable cause to warrant that a full evidentiary hearing be held on the issue of whether respondent was still an SVP—is a matter that is subject to a *de novo* standard of review on appeal.  There is some disagreement, however, in the various districts of the appellate court as to whether a *de novo* or an abuse of discretion standard of review should be applied.  See, *e.g.*, *In re Commitment of Rendon*, 2017 IL App (1st) 153201, ¶ 19 (applying a *de novo* standard of review); *In re Commitment of Kirst*, 2015 IL App (2d) 140532, ¶¶ 47-50 (recognizing that the standard of review to be applied on appeal to a trial court decision in a post-commitment probable-cause hearing is unsettled in Illinois law and ultimately applying a *de novo* standard of review); *In re Commitment of Galba*, 2017 IL App (3d) 150613, ¶ 10 (applying a *de novo* standard of review); *In re Ottinger*, 333 Ill. App. 3d 114, 120 (2002) (applying an abuse of discretion standard of review); *In re Detention of Cain*, 402 Ill. App. 3d 390, 396 (2010) (applying an abuse of discretion standard of review).  To our knowledge, the Illinois Supreme Court has not yet ruled upon the issue of the appropriate standard of review to be applied in these circumstances.  Because the trial court's determination in this case was based solely upon its consideration of documentary evidence (the reexamination report) and the parties' arguments, both of which we are fully capable of reviewing to the same extent as the trial court, we believe that the appropriate standard of review to be applied in this appeal is the *de novo* standard of review.[2]  See *Kirst*, 2015 IL App (2d) 140532, ¶¶ 47-50.

---

[2] The authoring Justice previously dissented on the issue of the standard of review and asserted that an abuse of discretion standard of review should be applied in circumstances that were somewhat different from those in the present case.  See *In re Commitment of Wilcoxen*, 2016 IL App (3d) 140359, ¶ 60 (Carter, J., dissenting).  In the *Wilcoxen* case, there were two different evaluation reports prepared on

17

¶ 42    After a person has been committed under the Act as an SVP, the Department must reexamine the person's mental condition at least once every 12 months. 725 ILCS 207/55(a) (West 2018); *Rendon*, 2017 IL App (1st) 153201, ¶ 20. The purpose of the reexamination is to determine whether: (1) the committed individual has made sufficient progress in treatment to be conditionally released; and (2) the individual's condition has so changed since the most recent periodic reexamination (or initial commitment, if there has not yet been a periodic reexamination) that he or she is no longer an SVP. 725 ILCS 207/55(a) (West 2018); *Galba*, 2017 IL App (3d) 150613, ¶ 9. At the time of each reexamination under the Act, the committed person must be given written notice that he or she has the right to petition the trial court for discharge. 725 ILCS 207/65(b)(1) (West 2018); *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 51; *Galba*, 2017 IL App (3d) 150613, ¶ 9. If the committed person does not affirmatively waive that right, the trial court must conduct a probable-cause hearing to determine whether facts exist to warrant that a full evidentiary hearing be held on the issue of whether the committed person is still an SVP (whether facts exist to believe that since the most recent periodic reexamination (or initial commitment, if there has not yet been a periodic reexamination), the condition of the committed person has so changed that he or she is no longer an SVP). See 725 ILCS 207/65(b)(1) (West 2018); *Stanbridge*, 2012 IL 112337, ¶ 51; *Galba*, 2017 IL App (3d) 150613, ¶ 9. In situations such as the present case, where the committed individual has not filed a petition for discharge and has not waived the right to file a petition, the probable-cause hearing consists only of a review of the reexamination report (or reports) and the arguments of the parties. See 725 ILCS 207/65(b)(1) (West 2018); *Stanbridge*, 2012 IL 112337, ¶ 51; *Galba*, 2017 IL App (3d) 150613, ¶ 10.

---

the respondent and the two reports had reached different conclusions. See *id.* ¶¶ 14, 21.

¶ 43        At the probable-cause hearing, the committed person has the burden to present sufficient evidence to warrant that a full evidentiary hearing be held on the issue of whether the committed person is no longer an SVP. See *Stanbridge*, 2012 IL 112337, ¶ 67; *Galba*, 2017 IL App (3d) 150613, ¶ 9. To satisfy that burden, the committed person must present sufficient evidence to establish a plausible account that he no longer meets the criteria for commitment in that he: (1) no longer has a mental disease; or (2) is no longer dangerous to others because his mental disorder no longer creates a substantial probability that he will engage in acts of sexual violence. 725 ILCS 207/5(f) (West 2018); *Galba*, 2017 IL App (3d) 150613, ¶ 11. In other words, the committed person must present some plausible evidence that demonstrates a change in the circumstances that led to the initial commitment. See *Stanbridge*, 2012 IL 112337, ¶ 72, 87 (discussing the post-commitment proceedings for discharge); *Rendon*, 2017 IL App (1st) 153201, ¶ 29. A change in circumstances could include a change in the committed person, a change in the professional knowledge and methods used to evaluate a person's mental disorder or risk of reoffending, or even a change in the legal definitions of a mental disorder or an SVP, such that a trier of fact could conclude that the committed person no longer meets the required criteria for commitment. See *Stanbridge*, 2012 IL 112337, ¶ 72; *Rendon*, 2017 IL App (1st) 153201, ¶ 29. If the trial court finds that probable cause exists, it must set the matter for a full evidentiary hearing on the issue. 725 ILCS 207/65(b)(2) (West 2018); *Stanbridge*, 2012 IL 112337, ¶ 52; *In re Commitment of Vance*, 2017 IL App (3d) 160683, ¶ 17.

¶ 44        After reviewing the record of the probable-cause hearing in the present case, we find that respondent failed in his burden to present sufficient evidence to warrant that a full evidentiary hearing be held on the issue of whether respondent was no longer an SVP. See *Stanbridge*, 2012 IL 112337, ¶ 67; *Galba*, 2017 IL App (3d) 150613, ¶ 11. As noted above, there is no dispute in

19

this case that respondent still had a mental disease—the mental conditions that were diagnosed by Dr. Hernandez. See 725 ILCS 207/5(f) (West 2018); *Galba*, 2017 IL App (3d) 150613, ¶¶ 9-11. The only question, therefore, was whether respondent had presented sufficient evidence to establish a plausible account that he was no longer dangerous to others because his mental disorder no longer created a substantial probability that he would engage in acts of sexual violence. See 725 ILCS 207/5(f) (West 2018); *Galba*, 2017 IL App (3d) 150613, ¶ 11. That question was conclusively answered, however, by the only evidence before the trial court at the periodic reexamination hearing—Dr. Hernandez's report. In that report, Hernandez found that respondent's "scores on [the] risk instruments and his additional risk factors support[ed] that he [was] substantially probable to engage in future acts of sexual violence" and that there were no protective factors that lowered respondent's risk of recidivism.

¶ 45     Although respondent claims that his age, deteriorating health, and confinement to a wheelchair established a plausible account that he no longer met the second criteria for commitment as necessary to satisfy his burden in the probable-cause hearing, respondent's contention is not supported by the record. Indeed, as the trial court noted, respondent had many of the same medical/health conditions before he was initially found to be an SVP. In addition, the record from the June 2016 periodic reexamination hearing shows that respondent was already using a walker and a wheelchair at that point. There is no indication in the current report by Hernandez that respondent's medical condition has substantially deteriorated since that time. Furthermore, as the State points out, no expert witness opined that respondent's age or medical condition reduced his risk to reoffend in this case. In conducting her reexamination of respondent, Hernandez considered respondent's age, medical condition, and confinement to a wheelchair and found that none of those matters served as protective factors here. Hernandez

20

noted in her report that she did not believe any further reduction in the risk to reoffend was required because of respondent's age and commented that the medical records did not show that respondent had any medical condition that would reduce his risk to reoffend. As for respondent's progress in treatment, Hernandez's report indicated that even though respondent had been committed in December 2014, he was still in the first phase of sex-offender treatment and that the treatment records showed that respondent had struggled with attendance, had declined to participate in some of the treatment groups offered to him, and had refused to take responsibility for his prior sex-related criminal conduct.

¶ 46          In short, respondent failed to present some plausible evidence to demonstrate a change in the circumstances that led to his initial commitment. See *Stanbridge*, 2012 IL 112337, ¶¶ 72, 87; *Rendon*, 2017 IL App (1st) 153201, ¶ 29. Contrary to respondent's assertion on appeal, the evidence before the trial court at the probable-cause hearing readily established that respondent continued to suffer from a mental disorder (which respondent did not contest here) and that his mental disorder continued to create a substantial probability that he would engage in acts of sexual violence. 725 ILCS 207/5(f) (West 2014). The trial court, therefore, did not err in granting the State's motion for a finding that there was no probable cause to warrant that a full evidentiary hearing be held in this case. See 725 ILCS 207/5(f) (West 2018); *Galba*, 2017 IL App (3d) 150613, ¶ 11.

¶ 47                                    III. CONCLUSION

¶ 48          For the foregoing reasons, we affirm the judgment of the circuit court of Rock Island County.

¶ 49          Affirmed.