2021 IL App (1st) 190712-U

No. 1-19-0712

Order filed March 30, 2021.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| IN RE COMMITMENT OF ENRIQUE RENDON, | ) ) | Appeal from the Circuit Court of |
| (The People of the State of Illinois, | ) ) | Cook County. |
| Petitioner-Appellee, | ) ) | |
| | ) | No. 98 CR 8000401 |
| v. | ) ) | |
| Enrique Rendon, | ) ) | The Honorable Peggy Chiampas, |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's judgment, following an evidentiary hearing, that defendant was still a sexually violent person not entitled to discharge was not against the manifest weight of the evidence, nor did the circuit court err in conducting the hearing. This court affirmed the judgment of the circuit court.

¶ 2    Following a bench trial, the circuit court found respondent Enrique Rendon was still a

sexually violent person (SVP) under the Sexually Violent Persons Commitment Act (the Act)

(725 ILCS 207/1 *et seq.* (West 2018)) and thus was not entitled to discharge from the Department of Health and Human Services (the Department). Respondent appeals from that judgment contending the decision was against the manifest weight of the evidence and the court applied an incorrect legal standard at the hearing. We affirm.

¶ 3                                    BACKGROUND

¶ 4                               *I. Procedural History*

¶ 5      Respondent, now age 73, has been civilly committed under the auspices of the Department for almost 20 years. Respondent was criminally convicted in 1989 of aggravated criminal sexual assault, aggravated criminal sexual abuse, aggravated kidnaping, and kidnaping, all stemming from his assault of an eight-year-old girl. Although sentenced to 16.5 years for those offenses, he served only six and was released on parole. In 1997, respondent violated his parole by repeatedly attempting to lure children into his vehicle. He was also found in bed by his 17-year-old daughter as he lay naked with her intoxicated friend, whose pants were pulled down. Thereafter, the State sought to have respondent civilly committed because he was too dangerous to be in society. Respondent admitted the allegations in the State's SVP petition and was diagnosed with pedophilia (sexually attracted to minor females), substance abuse problems, and later, paraphilia not otherwise specified (sexually attracted to non-consenting females), frotteurism (the act of rubbing against others for sexual gratification), and antisocial personality disorder.

¶ 6      From 2002 to 2010, respondent was placed in a "Treatment and Detention Facility" (TDF), which is basically a secure mental institution for sex offenders. There, he underwent sex offender treatment designed to reduce his risk of recidivism. During that time, respondent admitted to a variety of sexual offenses apart from the sexual assault and luring incidents

detailed above. We will not enumerate the many offenses but do note that his numerous self-reported illegal sexual acts began at age 11, spanned many years, and included more than 20,000 frottage offenses in public places like the "L" train, wherein he rubbed against young women for sexual gratification.

¶ 7    Following his treatment, in 2010, respondent was conditionally released, which allowed him to remain in the community but only while closely monitored and tested by mental health professionals. Several years later, in 2012, respondent's conditional release was revoked, but this court reversed that revocation in November 2014. See *In re Commitment of Rendon*, 2014 IL App (1st) 123090, ¶ 41 (*Rendon I*). In February 2015, respondent was allowed conditional release under maximum supervision. Four months into respondent's second stint on conditional release, in June 2015, a doctor reexamined respondent and determined he was still an SVP but conditional release remained appropriate.

¶ 8    Pursuant to this doctor's report, the circuit court found there was no probable cause to warrant a full evidentiary hearing to determine whether respondent was no longer an SVP. Removing the double negative, the court essentially ruled there was probable cause to believe that respondent was still an SVP, which vitiated any evidentiary hearing. This court reversed that judgment, finding that respondent was entitled to a full evidentiary discharge hearing under the Act. See *In re Commitment of Rendon*, 2017 IL App (1st) 153201 ¶ 24 (*Rendon II*). We noted that a preliminary probable-cause discharge proceeding is intended only to establish essential or basic facts as to probability and the respondent bears the burden of demonstrating only a "plausible account" that he's no longer an SVP. *Id*. ¶ 29. We held that respondent had met that low burden to obtain an evidentiary hearing, but we also noted that "the State may very well

establish by clear and convincing evidence at an evidentiary hearing that respondent should be denied discharge form the Department's legal custody." *Id.* ¶ 32.

¶ 9                                   *II. Discharge Hearing*

¶ 10    On February 19, 2019, a discharge hearing then proceeded on the heels of our decision, and it is the subject of the present appeal. Clinical psychologist Dr. Deborah Nicolai testified for the State, while clinical psychologist Dr. Brian Abbott testified for respondent. Dr. Nicolai was primarily employed by the Department, while Dr. Abbott was in private practice and performed forensic psychological evaluations. Both prepared reports[1] that were admitted as evidence at the hearing and opined as to whether respondent was still an SVP. At the hearing, both experts also discussed whether respondent should remain on conditional release if still an SVP. In preparing their reports, the experts interviewed respondent, his therapist, and his conditional release agent. They also reviewed respondent's criminal history, court documents, reexamination reports, Penile Plethysmograph (PPG) results, polygraph examinations, and conducted actuarial tests.

¶ 11                                  A. The State's Expert

¶ 12    Dr. Nicolai testified first for the State that respondent remained an SVP suffering from basically the same mental disorders as before, so he was not entitled to discharge. In support, Dr. Nicolai pointed to respondent's prior sexual conduct and other events during his treatment history showing that he remained a danger to the public. She highlighted respondent's various struggles with controlling and responding to his deviant thoughts or urges while in public and appropriately reporting them to mental health authorities. In short, his pockmarked history

---

[1]Dr. Nicolai's report was technically a reexamination report, which the Department submits every 12 months to determine whether "the person's condition has so changed since the most recent periodic reexamination *** that he *** is no longer a sexually violent person." 725 ILCS 207/55(a) (West 2018). The State then used this report at the discharge hearing given that the stated purpose was the same, to determine whether the respondent was still an SVP. See 725 ILCS 207/65(b)(2) (West 2018).

revealed he would make several steps forward in treatment, only to then falter with deviant secret-keeping or limited responses to sexual stimuli, and take several steps backwards, which resulted in curbed freedoms while on conditional release.

¶ 13    For example, Dr. Nicolai noted that dating as far back as 2011 and 2012, and while on conditional release, respondent lied during his polygraph in denying his strong urges and deviant fantasies. Rather than having *no* urges or fantasies, as he claimed, it was later revealed respondent was having "60 deviant sexual fantasies per month" about past offenses and making plans to bring women to his apartment.[2] Respondent disclosed he might not have admitted these fantasies but for the failed polygraph. Given that his deviancy was at a high point, he began taking Eligard, a prescription drug thought to lessen urges by lowering testosterone levels. He later limited masturbation given that it frequently led to deviant thoughts involving underage females and frottage.

¶ 14    In 2015, respondent entered maximum supervision conditional release, which allowed him only to take out the garbage, get his mail, and do laundry in his building. It also included surprise home visits and Department surveillance. Around then, respondent had deviant fantasies about a teenage prostitute after watching a parade on television and envisioned "walking through the crowd and rubbing against teenaged girls between the ages of 14 and 16." As before, respondent revealed these fantasies only after inconclusive polygraph results (revealing "no opinion"). Nonetheless, respondent maintained he had not masturbated, but rather, intervened when he felt arousal by smelling fox urine, the stated goal being associating a deviant stimuli with a "noxious substance."

---

[2]Dr. Nicolai noted on cross-examination that this level of deviancy wasn't revealed until respondent was taken from his conditional release and placed back in the treatment facility.

¶ 15    In 2016, although still on maximum supervision, respondent was allowed more latitude to look for a job, use public transportation by day, shop, and attend medical appointments. Respondent was doing very well in treatment and using interventions (like, in May 2016, he saw a woman in tight pants on the bus and had a deviant frottage thought but successfully intervened). Nonetheless, in July, respondent failed a polygraph and was placed on "lockdown," where he essentially had no movement without consent from an agent, whether it was getting mail or doing laundry. While unclear what prompted the failed polygraph, since he wasn't entirely candid with authorities, a treatment note from August 2016 revealed respondent had a deviant fantasy while watching television of a woman sitting at a bar, prompting him to think of past offenses where he would target intoxicated women, take them home, and rape them. Thereafter, respondent admitted he had purposefully omitted details with his treatment provider, and his therapist observed that it shouldn't have taken a failed polygraph to prompt such disclosure.

¶ 16    Due to noted progress, restrictions had lifted, but yet another failed polygraph in December 2017 resulted in lost privileges. Respondent at first claimed he failed the polygraph because he deviated from his selected mail route by crossing the street without telling his conditional release agent. After some pressing, respondent disclosed that in late summer or early fall of 2017, he had deviant sexual thoughts after a 12-year-old girl sat by him on the bus and her leg touched his leg. Respondent allowed the contact to continue for five seconds before moving to a different seat. He explained that he felt "something sexual" because "she was young and pretty" and when "her leg touched my side leg *** it felt good." He thought, "should I rub my leg against her leg," but instead moved. However, he reported "the urges were there, the intentions, I mean the urges." Respondent declined to disclose the interaction prior to his

polygraph because he believed his case management team would view the incident as a setback, and he didn't want his privileges rescinded.

¶ 17    Respondent also failed his polygraph in February 2018, related to whether he had initiated the physical contact with the minor on the bus or with any minor since then. While respondent's therapist emphasized the importance of truthfulness and transparency, he believed respondent was not being truthful about the incident since it seemed respondent actually initiated the physical contact possibly by "moving his leg towards her leg," which was a pattern consistent with respondent's frottage offenses. In her report, Dr. Nicolai noted that respondent first disclosed that the child on the bus was male; only after his failed polygraph did respondent reveal the child was female. This lack of forthrightness was concerning to Dr. Nicolai, as she noted "the effectiveness of interventions to lower risk depends on [respondent's] willingness to discuss his deviant thoughts/fantasies[.]"

¶ 18    Dr. Nicolai testified that everyday encounters were challenging for respondent and he had only limited intervention methods. For example, in June 2018, respondent was installing an air conditioning unit in his window when he saw a 10-year-old girl outside with her legs open and immediately had a deviant sexual thought. He used fox urine to intervene, but the thoughts returned 20 minutes later. Respondent then "started to work on his ingrown toenail [so] as to inflict physical pain onto himself to get him to stop thinking about this child." Also in April 2018, while waiting for a cab, respondent needed to use a restroom. The nearest restaurant was crowded with minor children and so respondent "urinated on himself to avoid going into the restaurant and being aroused by the children."

¶ 19    In his May 2018 interview with Dr. Nicolai, respondent admitted that treatment was "a struggle" and that he was still working on ways to lower his risk. He stated that if discharged, he

would like to masturbate again and be in a consensual sexual relationship. As a result, he might stop taking Eligard, the prescription medication thought to decrease sexual arousal, which respondent had taken since 2011. When asked how he would manage his increased deviant arousal, respondent stated, "or maybe [I'd] keep taking [Eligard]."

¶ 20    In May 2018, the same month Dr. Nicolai evaluated respondent, she spoke with his therapist who expressed concerns about respondent's level of honesty and disclosure, noting "the effectiveness of interventions to lower risk" was dependent upon respondent's "willingness to discuss his deviant thoughts/fantasies." The provider noted that respondent, who struggled with "thought building," had been "reporting less and less as opposed to being more transparent, as one would expect in treatment progress." And, while respondent's PPG results from 2013, 2015, and 2016, showed he did not demonstrate signs of arousal to any deviant or non-deviant segments, respondent reported that his Eligard medicine was causing erectile dysfunction, thus nullifying the PPG's significance.

¶ 21    Considering all the relevant information and using the Diagnostic and Statistical Manual of Mental Disorders, fifth edition (DSM-5), Dr. Nicolai diagnosed respondent with pedophilia, paraphilia[3], frotteurism, antisocial personality, and alcohol use disorder. She explained that paraphilia (*i.e.* the intense and persistent sexual interest) became a disorder, as in this case, where it caused an individual distress, impairment or entailed risk of personal harm to self or others. She further explained that the paraphilia was a chronic disorder that did not dissipate with time but could only be managed with treatment and supervision. She noted respondent had a long

---

[3]Dr. Nicholai diagnosed respondent with the same mental disorders as previous evaluators, only she noted his paraphilia was "specified" insofar as he was sexually attracted to non-consenting females in a controlled environment, although his history revealed it was "not otherwise specified." Dr. Nicolai clarified that respondent was attracted to and having sexual relations with non-consenting females, such as those who were sleeping, intoxicated, or resisting sex to the point where he used a knife on them. She also noted that his alcohol use was in remission due to his controlled environment.

history of nonconsensual sexual activity with females and continued to exhibit signs of sexual interest in non-consenting females, including having deviant sexual fantasies about rape, force, and frottage. Likewise, respondent's pedophilia disorder was supported by his history of committing sex offenses against young children and his admission that he would impulsively think of having sex with young children and had such urges when around them, as evidenced by the incident with the 12-year-old girl on the bus. Dr. Nicolai testified that respondent acknowledged struggling with this disorder. And respondent continued to suffer from frotteuristic disorder because of his history of rubbing against non-consenting people for sexual gratification and he continued to report sexual fantasies related to frottage, and also experience sexual urges to attend crowded places to engage in that behavior.

¶ 22    Per her actuarial assessment, respondent remained substantially probable to reoffend. Although respondent scored a 1 on the Static-99R and a 4 on the Static-2002R actuarial instruments, placing him in the above-average to average risk category, those scores did not reflect his present risks or account for his 1996 offense of sexually assaulting his daughter's friend, which was his most recent sexual offense. Dr. Nicolai testified it was important to examine "dynamic factors" and in that sense, the Stable-2007 essentially was a more accurate test for individuals in the community on conditional release. On that test, respondent scored a 14 out of 26, reflecting a "high level of dynamic risk or criminogenic needs." Dr. Nicolai elaborated that respondent was "still very sexually preoccupied," meaning he was focused on deviancy, had impulsivity, and difficulty with authority, all reflecting increased risk. While she noted age was generally a protective factor, it was not so in this case given respondent's abnormally high interest in both normal and deviant sexual activity. Nor did respondent's physical condition reduce his risk.

¶ 23     All that, plus his lack of transparency in treatment and failed polygraphs, increased respondent's risk of reoffending and resulted in his maximum supervision while on conditional release. This, in turn, led to social isolation, which was yet another risk factor. Other empirical risk factors were respondent's paraphilia, intimacy defects, and history of sexualized violence. Dr. Nicolai believed that respondent had "additional factors that are external to the actuarial instruments used in this examination but have been empirically demonstrated to increase risk of sexual re-offense."

¶ 24     Given these facts, Dr. Nicolai opined to a reasonable degree of psychological certainty that respondent suffered from mental disorders affecting his emotional or volitional capacity making it substantially probable that he would engage in acts of sexual violence. Accordingly, Dr. Nicolai found respondent remained an SVP and recommended he continue to be managed and treated within the community while on conditional release. Dr. Nicolai testified that she had reviewed respondent's records since her May 2018 report, and neither her diagnoses nor her opinions as to respondent had changed.

¶ 25                           B. The Respondent's Expert

¶ 26     Contrarily, respondent's expert witness, Dr. Abbott, testified that to a reasonable degree of psychological certainty, respondent was *not* an SVP because he no longer suffered from his past mental disorders and as such he was not substantially probable to reoffend. While acknowledging respondent's past diagnoses were consistent with his self-reported sexual offense history, Dr. Abbott believed these disorders had fully remitted. For example, Dr. Abbott opined that respondent was not suffering from pedophilia because since 2010 he hadn't reported recurrent and intense sexually-arousing urges or sexual fantasies towards prepubescent children. Dr. Abbott noted respondent's home had been searched repeatedly with no evidence of

pedophilic interests or arousal present. Dr. Abbott pointed out Eligard had lowered respondent's deviant arousal to children, and he showed no deviant arousal in his recent PPG examinations. Dr. Abbott asserted respondent was in fact "repulsed," rather than aroused, by "fantasies or thoughts of children."

¶ 27    When asked how to assess "serious difficulty in controlling sexually-violent behavior," Dr. Abbott responded:  "Well, the only way I can reasonably assess it is by finding some recent objective indicia that the person is expressing words or demonstrating behavior that they're having difficulty controlling sexually-violent urges." For pedophilia, he again cited as an example "[s]omeone who's caught with child porn" or "telling [his] therapist he's having difficulty controlling urges to molest children." Dr. Abbott expressed that he couldn't find these things in respondent.

¶ 28    Dr. Abbott maintained the same as to the paraphilia and frotteuristic diagnoses, finding respondent had not reported intense non-consensual sexual fantasies or frottueristic urges since 2010. Similarly, Dr. Abbott found no evidence of alcohol use disorder since no one had observed respondent consuming or possessing alcohol, he did not exhibit any symptoms, and he understood its detrimental effects. As to respondent's antisocial personality disorder, Dr. Abbott testified that he couldn't find any recent evidence (viewing the totality of the circumstances) of respondent exhibiting such personality traits for "at least ten years, if not longer." Test results were "consistent with someone who does not suffer" from that mental illness, and research also showed that mental illness remitted with age. Dr. Abbott explained that a person who suffers from antisocial personality disorder habitually violates rules, and if respondent really had that, he'd be right back in the TDF.

¶ 29    Dr. Abbott further opined that even if respondent did suffer from a "legally-defined mental disorder," he was *still not* substantially probable to engage in acts of sexual violence. In support, Dr. Abbott pointed to respondent's Eligard treatments as having eviscerated his "sexual preoccupations" and given him the ability to avoid deviant arousal through cognitive behavioral treatment. He added that respondent had also effectively learned interventions, like sniffing fox urine to interrupt deviant thoughts or engaging in other activities, so as to redirect him. In addition, respondent spoke of these matters in both individual and group therapy. As a result, respondent was effectively managing his "occasional" sexual thoughts.

¶ 30    As to testing, Dr. Abbott used the Static-99R and Violence Risk Scale-Sex Offender Version (VRSSO). Respondent scored a 2 on the Static-99R, reflecting an average risk level. Dr. Abbott explained that the Static-99R measured historical risk, while the VRSSO measured risk based on a person's history both before and after treatment and thus took into account dynamic risk factors. He explained that the VRSSO was more sensitive to treatment-related change than other actuarial tests like the Stable-2007, which Dr. Nicolai used. Dr. Abbott noted people in treatment usually showed a 40 or 50 percent reduction in sexual recidivism risk. He explained that respondent had a pre-treatment score of 41 and a post-treatment score of 21 with the combined tests, which meant respondent showed a 90 percent decrease in sexual recidivism risk. The tests Dr. Abbott used showed that 96 to 99 percent of offenders sharing respondent's risk profile would not reoffend. In other words, he noted the "group best representing" respondent "reflects a sexual recidivism base rate" of 5 to 10 percent. He testified that in fact "someone with [respondent's] risk profile is substantially probable *not* to re-offend sexually." (emphasis added). He opined that "substantially probable" meant greater than 50 percent.

¶ 31 On cross-examination, Dr. Abbott acknowledged that the VRSSO was based on sex offenders who were in treatment for one year or less, and the validity of the test had not been established for use on people in long-term treatment like respondent.

¶ 32 Dr. Abbott also acknowledged that respondent had been on maximum supervision since 2015 and gradual movement towards minimum supervision would enable respondent to better integrate into the community and practice intervention strategies in a more realistic setting prior to discharge. Dr. Abbott further acknowledged that after readmission to the TDF in 2012, respondent admitted masturbating to deviant rape fantasies and formulating a plan to lure women into his apartment while on conditional release; he began using fox urine for intervention in 2015 and reported frottage thoughts in 2018. Dr. Abbott stated that in the interview, respondent relayed he would continue to take Eligard if discharged; however, Dr. Abbott was unaware of respondent's statement to Dr. Nicolai that he would possibly discontinue Eligard. Also, there was no indication that respondent would continue sex offender treatment if discharged. Finally, Dr. Abbott acknowledged that while respondent showed no arousal in his recent PPG exams (to deviant or other stimuli), such a result was expected given that Eligard made getting an erection difficult. Dr. Abbott concluded his testimony, and respondent declined to testify on his own behalf.

¶ 33 The parties then provided extensive closing arguments as to whether respondent should be discharged. In a detailed and thoughtful oral ruling, the trial court reviewed the evidence and competing expert testimony, finding Dr. Nicolai more credible than Dr. Abbott. Accordingly, the court found the State had proved by clear and convincing evidence that respondent was still an SVP. Specifically, the court found that respondent still had "a high level of need" and exhibited "significant difficulties on his conditional release." The court noted problematic behaviors

included respondent's inability to remain truthful in treatment to address his still present urges, his limited intervention methods (like using fox urine), his desire to cease the Eligard once discharged, and causing pain to himself so as to avoid arousal to various real-world stimuli. The court found respondent needed to address cognitive distortions so he could act in the community on a more practical level and expand his range of interventions. The court noted that while respondent had made progress and "may even be ready to move from that maximum supervision stage," he continued to suffer from mental disorders that made him substantially probable to reoffend. Accordingly, the court denied respondent his requested discharge. This appeal followed.

¶ 34                                                    ANALYSIS

¶ 35    The Act authorizes the involuntary civil commitment of "sexually violent persons" for "control, care and treatment." 725 ILCS 207/40(a) (West 2018); *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 48. The Act defines a "sexually violent person" as an individual who has "been convicted of a sexually violent offense" and who "is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2018); *Stanbridge*, 2012 IL 112337, ¶ 48; see also See *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 43 (noting, the term "substantially probable" means much more likely than not). A "mental disorder" is defined under the Act as a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2018); *Stanbridge*, 2012 IL 112337, ¶ 48. If the State proves beyond a reasonable doubt that an individual is an SVP, that individual may be *indefinitely committed* "until such time as the person is *no longer* a

sexually violent person." (Emphasis added.) 725 ILCS 207/35(f), 40(a) (West 2018); *Stanbridge*, 2012 IL 112337, ¶ 48.

¶ 36    As set forth, respondent has been civilly committed to the Department since 2002. The hearing in this case was to determine whether after all these years, respondent's condition had so changed such that he was "no longer a sexually violent person," but rather entitled to discharge from the Department. 725 ILCS 207/65(b)(2) (West 2018). Indeed, the SVP law is predicated upon the possibility that a person can successfully be engaged in treatment that would remove the diagnosis of SVP, thus entitling him to release. *Rendon II*, 2017 IL App (1st) 153201, ¶ 38. The State had the burden of proving by clear and convincing evidence that respondent was still an SVP. See 725 ILCS 207/65(b)(2) (West 2018).

¶ 37    Here, the trial court found that while respondent had made much progress, respondent was still an SVP. Respondent now challenges that judgment and asks that we reverse it, but we observe that such a determination will not be disturbed unless it is against the manifest weight of the evidence, *i.e.* only if an opposite conclusion is clearly apparent. See *People v. Donath*, 2013 IL App (3d) 120251, ¶ 38 (noting same standard of review under the Sexually Dangerous Persons Act (725 ILCS 205/1.01 (West 2018)); see also *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 977-78 (2006) (applying same standard as to whether a respondent should be conditionally released). Specifically, respondent argues the State failed to prove he had a mental disorder under the Act and is dangerous because the mental disorder makes him substantially probable to engage in acts of sexual violence. He maintains that Dr. Nicolai "gave no explanation for her opinion that these diagnoses are mental disorders under the SVP Act."

¶ 38    We find respondent's contention belied by the record. Here, the State presented clear and convincing evidence that despite respondent's almost 20 years of treatment in civil detention, he

had not succeeded in addressing his sexual preoccupations or core issues that predisposed him to reoffend, and thus, he was still an SVP. Dr. Nicolai diagnosed respondent with the DSM-5 disorders of pedophilia, paraphilia, frotteurism, and opined that, under the Act, these disorders constituted a condition affecting respondent's emotional or volitional capacity that predisposed him to engage in acts of sexual violence. See 725 ILCS 207/5(b) (West 2018) (defining "mental disorder"); 725 ILCS 207/5(f) (West 2018) (defining "sexually violent person"); see also *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶¶ 74-76 (likewise finding the expert connected "the dots between respondent's risk of reoffending and his mental disorder."); *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 64 (same). Dr. Nicolai provided clinical definitions of the mental disorders and explained why she diagnosed the respondent with the disorders.

¶ 39    Contrary to Dr. Abbott's conclusions otherwise, and as the court found, Dr. Nicolai cited both historical facts and recent anecdotal evidence supporting her diagnoses that respondent continued to have fantasies of rape, force, and frottage, and his intense sexual interest in non-consenting females and children had not dissipated. See *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 59 (noting, experts are not prohibited from relying on the underlying behaviors manifested during prior offenses in the diagnosis of a particular mental disorder). Of particular concern was the episode with the 12-year-old girl on the bus, wherein respondent allowed his leg to touch the girl's leg, as he felt "something sexual" because "she was young and pretty," and thought, "should I rub my leg against her leg," before moving to a different location. He later reported "the urges were there, the intentions, I mean the urges," but his disclosure came only after attempting to hide the interaction and sex of the child (first reporting it to be a male) from his treatment providers for fear of losing privileges. Dr. Nicolai noted respondent's therapist

believed he initiated the contact, and respondent admitted the interaction only after the failed polygraph, which was concerning given that full treatment and interventions to lower risk were dependent on disclosure of deviant thoughts/fantasies.

¶ 40    Other anecdotal evidence of respondent's volitional problems included his inability to cease sexually deviant thoughts about the 10-year girl whom he merely observed outside the window without digging into his ingrown toe nail, plus his having urinated on himself rather than entering a restaurant filled with young kids. These incidents do not inspire belief that he would be able to control himself from engaging in criminal sexual behavior if discharged. Likewise, respondent's statement (of which Dr. Abbott was unaware) that he might stop taking Eligard if discharged is particularly problematic. Given Dr. Abbott's testimony that respondent's mental diseases had remitted due to cognitive therapy, *and notably, Eligard*, a drug he was considering ceasing, we cannot say the trial court's decision to disregard Dr. Abbott's testimony was incorrect.

¶ 41    In addition, Dr. Nicolai testified that respondent's age of 71 did not diminish the risk of reoffending given his intense preoccupation with normal and deviant sexual activity. Furthermore, he did not suffer from any physical ailment or medical condition that would have interfered with his ability to offend. As for actuarial instruments, she testified that dynamic risk factors reflected an increased risk, as did respondent's lack of transparency in treatment, failed polygraphs, and social isolation. While Dr. Abbott testified to the contrary that both actuarial testing, dynamic factors, and respondent's mental state made him no longer an SVP probable to reoffend, the trial court found Dr. Nicolai more credible. Based on the aforementioned evidence, we cannot say the opposite conclusion is clearly evident.

¶ 42    Respondent's claims on appeal simply attack the weight of the evidence and witness credibility. However, it was for the trial court to determine the weight given to the experts' testimony and other documentary evidence, and we decline respondent's wish to reweigh the evidence. See *Gavin*, 2019 IL App (1st) 180881, ¶ 39; *Donath*, 2013 IL App (3d) 120251, ¶ 41; see also *Sandry*, 367 Ill. App. 3d at 979-80 (noting, where factual findings are based upon credibility determinations, a reviewing court will generally defer to the trial court because it is in the best position to assess the witnesses' conduct, demeanor, and credibility).

¶ 43    Respondent next argues the court improperly limited the scope of the discharge hearing by considering only evidence from respondent's current reevaluation period. For example, he maintains the trial court declined to consider his decades-long treatment or that he was on conditional release without reoffending. Respondent asks that we remand the cause due to the court's "misapprehension" of the law, which was a violation of his due process rights.

¶ 44    Respondent's due process rights at a discharge hearing are enshrined in the Act, which provides that a committed person is entitled to be present at a discharge hearing before a judge or jury (here, respondent chose a judge), and also entitled to the protections afforded in section 25 of the Act. *Id.* That section requires that the respondent receive a copy of the petition alleging he's an SVP, and it guarantees respondent the right to be present at the hearing while represented by counsel, to remain silent, to present and cross-examine witnesses, and also have the hearing recorded. 725 ILCS 207/25 (West 2018). In addition, both the State and respondent may retain experts or professionals of their choice to perform the examination of respondent, and these examiners "shall have reasonable access to the person for the purpose of the examination, as well as to the person's past and present treatment records and patient health care records." *Id.*

¶ 45     By way of example, respondent maintains the trial court improperly limited his attorney's extensive, pages-long cross-examination of Dr. Nicolai, thereby cutting short questions as to his treatment history. He points to an instance when respondent's attorney asked Dr. Nicolai about whether respondent immediately began treatment at the TDF in 1998. The State objected that "we are not talking about what [respondent] has been doing at the TDF," but rather how he had been doing in the last review period. While overruling the objection, the court clarified that such questions involved "basic background information," which the court "will take that for \*\*\* unless it is tied up in some other way." In other words, the court ruled that it would consider evidence involving defendant's historical background when relevant to his status as an SVP. We find no error in the court's consideration of relevant evidence, especially given respondent's extensive history.[4] See *Gavin*, 2019 IL App (1st) 180881, ¶ 59 (noting, evidence is relevant if it has any tendency to make the existence of any fact of consequence to the cause's determination more or less probable).

¶ 46     We thus find respondent's various contentions of trial court error are belied by the record, which shows that the court carefully considered the evaluations and competing opinions of the two witnesses, Dr. Nicolai for the State and Dr. Abbott for respondent, at respondent's bench trial. Each performed an evaluation and testified as to their conclusions after reviewing respondent's "past and present treatment records and patient health care records," as required by the Act (see 725 ILCS 207/25 (West 2018)), and also after interviewing respondent's conditional release agent, therapist, and respondent, himself. In so doing, both experts took into account respondent's longtime criminal and mental health history as an SVP and current status. Thus,

---

[4]Notably, respondent's attorney, when cross-examining Dr. Nicolai, made a number of offers of proof. However, respondent does not explain how such evidence would further his position now had it been admitted. See *Ramos v. Kewanee Hospital*, 2013 IL App (3d) 120001, ¶ 37 (noting, it's the appellant's burden to develop an argument with citation to relevant authority).

contrary to respondent's contention otherwise, the court appropriately considered relevant historical factors within in the context of the recent reevaluations.

¶ 47     This is consistent with our prior conclusion that "review of a reexamination report does not preclude consideration of a respondent's full mental health and sexual history or relevant historical facts," but still the court "must consider the professional conclusions as to a respondent's status in the most recent report and any changed circumstances." *Rendon II*, 2017 IL App (1st) 153201, ¶ 23. Indeed, "it is common sense that a court would turn to the most recent professional examination of a respondent to answer this very important public safety question. For example, if a sex offender had regressed in treatment to the point where a professional recommends no discharge, it would make little sense for a court to cite an examination report from two years prior stating that respondent had made significant progress and then allow discharge based on that previous report." *Id.*

¶ 48     Respondent also argues the court improperly deferred to reports by his non-testifying therapist and Department officials that he remain on maximum supervision "when the circuit court's role was to determine whether [respondent] requires any supervision." Respondent argues the polygraph tests were improperly relied upon to justify his maximum supervision status, which was an irrelevant matter. We reject this rather convoluted contention for several reasons.

¶ 49     First, as the State notes, a pertinent factor in determining whether respondent was still an SVP was how he functioned outside a secure setting while on conditional release. Could he then control his sexual thoughts and behaviors? Dr. Nicolai testified that respondent's maximum supervision status reflected his limited treatment progress, failed polygraphs, and inability to successfully integrate into society, all risk factors for reoffending. She noted his maximum supervision status was thus important in her multi-factored evaluation. Dr. Abbott himself

acknowledged that stepping down from maximum supervision but remaining on conditional release would permit respondent to practice intervention methods more realistically before discharge. And, although respondent challenged Dr. Nicolai on cross-examination as to the efficacy of polygraph exams, he did not then and does not now argue they cannot be used on sex offenders under the Act. Indeed, the Act permits polygraphs for information-gathering and to gauge treatment progress, supervision, and compliance, which is just what was done in this case. See 725 ILCS 207/65(b)(2) (West 2018); 20 Ill. Add. Code 1905.150(c)(3), (c)(6), (c)(12). They are but one of the many tools used to evaluate a sex offender. See 725 ILCS 207/65(b)(2) (West 2018); 20 Ill. Add. Code 1905.150(c)(12) ("Polygraph results should be one of the many variables for treatment providers to utilize when changing a client's status in treatment.").

¶ 50    Second, nothing in the Act requires that every healthcare provider (like respondent's therapist) testify in order for an expert to rely on the provider's assessment of respondent; in fact, that Act suggests the opposite as set forth above. See 725 ILCS 207/25 (West 2018). Respondent's attorney made no such objection or argument below as to non-testifying witnesses, thereby forfeiting the matter. See *Rendon I*, 2014 IL App (1st) 123090, ¶ 39. Moreover, respondent's argument ignores that his own expert relied on the same non-testifying therapist to conclude that respondent should be discharged. Respondent cannot complain of an error that he himself acquiesced to or invited. See *id*. (noting, a party cannot complain of an error to which he consented).

¶ 51    Third, while it was true that the purpose of the hearing was to determine whether respondent should be discharged (see 725 ILCS 207/65(b)(2) (West 2018)), the Act provides that if the court "is satisfied that the State has met its burden of proof" at the discharge hearing, then "the court may proceed under Section 40 to determine whether to modify the person's existing

commitment order." 725 ILCS 207/65(b)(3) (West 2018). Section 40 entails determining whether an SVP should be in a secure facility or on conditional release. 725 ILCS 207/40(b)(2) (West 2018). This is just what the court did. The court cited a multitude of evidence, of which respondent's maximum supervision status was but one factor, in concluding that respondent was still an SVP. The court also considered, as required, whether respondent should remain on conditional release.[5] Respondent's status while on conditional release thus was not irrelevant. Accordingly, respondent's contentions as to how the trial court conducted the discharge hearing have no merit.

¶ 52                                    CONCLUSION

¶ 53     For the reasons stated, we affirm the judgment of the circuit court denying respondent's requested discharge from civil commitment as an SVP.

¶ 54     Affirmed.

---

[5]Notably, in closing arguments at the discharge hearing, respondent's attorney noted there were two choices in this case - conditional release or discharge and argued for the latter. The court, after finding respondent was not entitled to discharge, held respondent would remain on conditional release and the State conceded that was appropriate, but the parties agreed to continue the matter of whether it should be maximum supervision conditional release to the next court hearing. That hearing is not part of the record on appeal.